COURT OF APPEALS
DECISION
DATED AND FILED

July 22, 2026

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2024AP356-CR**

**STATE OF WISCONSIN**

Cir. Ct. No. 2018CF467

**IN COURT OF APPEALS
DISTRICT II**

STATE OF WISCONSIN,

   PLAINTIFF-RESPONDENT,

 V.

JAMES MICHAEL HEINEMEIER,

   DEFENDANT-APPELLANT.

APPEAL from a judgment and orders of the circuit court for Washington County: JAMES G. POUROS and JAMES K. MUEHLBAUER, Judges. *Affirmed*.

Before Neubauer, P.J., Grogan, and Lazar, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1     PER CURIAM. James Michael Heinemeier appeals from a judgment of conviction entered following a court trial wherein the trial court found him guilty of second-degree sexual assault contrary to WIS. STAT. § 940.225(2)(cm) (2023-24)[1] and third-degree sexual assault contrary to § 940.225(3)(a). He also appeals from orders denying his postconviction motions and motion for reconsideration. Heinemeier raises multiple due process claims as well as a claim that he received ineffective assistance of counsel and that the trial court improperly considered hearsay evidence. We reject each of Heinemeier's contentions. Accordingly, we conclude the postconviction court did not err in denying Heinemeier's motions and therefore affirm.

## I. BACKGROUND

¶2     According to the Complaint, Oakley, then 18 years old, spent the night at her Aunt Renee's home on September 23-24, 2018, after drinking multiple alcoholic beverages.[2] Oakley reported that she awoke in the middle of the night to Heinemeier, who lived with and who was in a long-term romantic relationship with Renee, pulling her pants and underwear off and that Heinemeier, who was naked, thereafter kissed her face, stomach, and side and rubbed and penetrated her vagina with his penis. In October 2018, the State charged Heinemeier with one count of second-degree sexual assault and one count of third-degree sexual assault arising from this incident. *See* WIS. STAT. § 940.225(2)(cm), (3)(a). Section 940.225(2)(cm) prohibits:

---

[1]  All subsequent references to the Wisconsin Statutes are to the 2023-24 version.

[2] Oakley and Renee are pseudonyms. Because Oakley is related to many of the individuals referenced herein, we use pseudonyms for all individuals aside from Heinemeier himself to protect her identity. *See* WIS. STAT. RULE 809.81(8) and WIS. STAT. RULE 809.86.

> sexual contact or sexual intercourse with a person who is under the influence of an intoxicant to a degree which renders that person incapable of giving consent if the defendant has actual knowledge that the person is incapable of giving consent and the defendant has the purpose to have sexual contact or sexual intercourse with the person while the person is incapable of giving consent.

*Id.* Section 940.225(3)(a) prohibits "sexual intercourse with a person without the consent of that person[.]" *Id.*

¶3 The matter proceeded to a three-day circuit court trial after Heinemeier waived his right to a jury trial.[3] Oakley testified extensively, as did multiple additional witnesses. The testimony as relevant on appeal is as follows. Oakley testified that mid-afternoon on September 23, 2018, she met up with Heinemeier, Renee, and her Aunt Jane at Doman's, a local bar, to watch the Green Bay Packers game. According to Oakley, Heinemeier and her aunts were all showing "signs of alcohol consumption" and "were very flamboyant, just the way you get when you start to get drunk[,]" when they left Doman's. Oakley then drove the group to Buzdum's, another bar, where Jane's husband, Oakley's Uncle Ed, also joined them. Oakley did not consume any alcohol at either location; however, Heinemeier, Renee, and Jane all had multiple bottles of beer at Doman's, and they, along with Ed, continued to drink at Buzdum's.

¶4 The group eventually left Buzdum's and returned to Heinemeier's and Renee's home whereupon everyone, now including Oakley, continued to drink. Oakley confirmed Renee made her multiple mixed drinks consisting of vodka, Fresca, and a flavored/sparkling water called Ice. Oakley recalled having

---

[3] The Honorable James G. Pouros presided over the circuit court trial and imposed the sentence in this matter.

five or six of these mixed drinks and believed each drink may have had two shots of vodka—although she was "not 100 percent certain"—and that she was drinking for "a couple of hours." Oakley said she typically would not drink "nearly as much [vodka] as [she] drank that night" and that she felt "[e]xtremely intoxicated" and "was stumbling[,]" "could barely walk forward[,]" was "[r]eally dizzy[,]" and "wanted to lay down" because she felt "really sick to [her] stomach[.]" The get-together began to wind down sometime after midnight, and Oakley eventually fell asleep or passed out on a futon mattress in the living room area while watching television. Renee went to bed upstairs, Jane and Ed left, and Heinemeier remained downstairs.

¶5 Oakley awoke in the middle of the night to Heinemeier "kissing on" her face and neck and "[p]ulling [her] pants off[,]" and he later kissed her stomach and touched her "all over [her] body." Heinemeier was not wearing clothes, and Oakley could feel "his bare skin on" her. After removing Oakley's pants and underwear, Heinemeier "rolled" her onto her back and "forced [her] legs apart[,]" and while on top of her, Heinemeier was "[t]hrusting himself into" her vagina. At some point Heinemeier lifted Oakley's shirt; however, she remained clothed from the waist up.

¶6 Oakley described comments Heinemeier made to her during the assault, which included "*you are so innocent*" and "that he was going to finish inside" her. Oakley explained she did not respond because she "was extremely intoxicated" and said she tried pulling a blanket between them while "laying there shaking." In addition to "shaking profusely[,]" Oakley "thought [she] was having a seizure" and "a heart attack at the same time[,]" and she did not say anything or scream out because she "was intoxicated," "shocked," "scared[,]" and felt like she "was dying." Oakley repeatedly confirmed she had not said "no" in response to

4

Heinemeier's actions and explained this was due to being "terrified[,]" "shaking[,]" and "going in and out of consciousness[,]" which she attributed to drinking alcohol.

¶7 Oakley also recalled that after pulling the blanket between her body and Heinemeier's, she felt warm and "passed back out right away." She described herself as going in and out of consciousness, which she said felt like being under an anesthetic. Oakley again woke up to Heinemeier kissing and touching her while "[w]hisper[ing] gross things" about "want[ing] to finish inside of [her]" and telling her that she looked innocent. Oakley testified this occurred—Heinemeier assaulting her and then her "passing back out and waking back up to him on top of" her—"three or four times." She did not recall how many times Heinemeier had thrust his penis into her vagina but was confident he had done so at least once; however, she was unsure whether he had ejaculated. Oakley also confirmed Heinemeier called her by her nickname during the assault. After Heinemeier passed out, Oakley "grab[bed her] clothes from underneath him"—although she could not find her underwear—and left to go home despite still feeling the effects of alcohol.

¶8 Oakley called her boyfriend, Grant, and told him Heinemeier had "raped her." Grant drove to Oakley's house and convinced her to tell her parents, which she did, and her father contacted the police. Oakley confirmed she was no longer feeling the effects of alcohol by the time the first officer arrived, that she had described what occurred to multiple law enforcement officers, and that she went to the hospital where a sexual assault nurse examiner both examined her and administered a rape kit to swab for DNA evidence. Testing later confirmed DNA from a sample of dried secretions consistent with kissing, licking, or repeated, intentional touching matched Heinemeier's DNA profile.

5

¶9 During cross-examination, Oakley admitted that although she had not initially reported having consumed anything other than alcohol to law enforcement or the nurse, she had smoked marijuana with Heinemeier "[t]hroughout the night" and Renee, Jane, and Ed had also been smoking marijuana. Oakley volunteered that Heinemeier, Renee, Jane, and Ed "were smoking meth as well[,]" and when defense counsel asked if she "also took some meth[,]" Oakley responded "No. No. No. No, I did not."[4] When pressed, Oakley said she did "not recall taking any meth" and that she "would recall taking meth if" she had done so; however, she confirmed she had taken "speed" while driving from Doman's bar to Buzdum's after Heinemeier had given it to her and said she did not know whether speed and meth were the same thing. She additionally testified that when Heinemeier, Renee, Jane, and Ed smoked meth from a pipe later in the evening, she had only pretended to do so. Oakley did not report using drugs because she was afraid of her parents—particularly her mother—finding out and because she did not think it was necessary to do so when reporting the assault.

¶10 Jane, Renee, and Ed testified extensively about the alcohol and drug use that night. Jane and Renee confirmed they, along with Heinemeier, had multiple beers at Doman's (the first bar), that all three, including Ed upon joining them at Buzdum's (the second bar), continued to drink, and that Oakley did not consume alcohol at either location. Ed likewise did not observe Oakley drinking alcohol at Buzdum's and confirmed he had a few drinks upon meeting up with the group. Jane denied that anyone seemed intoxicated upon leaving Doman's; Renee, however, described Heinemeier as having had at least a half-dozen beers

---

[4] "Meth" refers to methamphetamines.

there and that he seemed "[b]uzzed" and "had another seven or eight" bottles of beer at Buzdum's.

¶11    Jane, Renee, and Ed also confirmed that everyone continued to drink upon returning to Heinemeier's and Renee's home and that Oakley began drinking at that point as well. Jane did not believe Oakley had more than four drinks and initially testified Oakley "was not impaired[,]" although she later agreed it would have been "unsafe" for Oakley to drive and that "there was a degree of intoxication[.]" Additionally, when asked whether she recalled having previously told a detective that Oakley had been intoxicated, that Oakley's "language and behavior" had changed after she began drinking, that Oakley "appeared more than a little buzzed[,]" and that "this was the most intoxicated" she had seen Oakley, Jane responded "Yes." She also confirmed having told the detective something to the effect that Oakley had seemed to be "stumbling and unsteady[.]"

¶12    Like Jane, Renee testified that Oakley did not have more than four drinks and said she (Renee) made all of the drinks, each of which contained one shot of vodka. Renee did not think Oakley was intoxicated, and she also denied having previously informed law enforcement she was concerned about Oakley that night because she appeared intoxicated, that Oakley had seemed unsteady on her feet, and that Oakley had fallen down. Ed likewise denied that Oakley "ever looked crazy intoxicated" and agreed that her speech did not seem slurred, she did not seem unsteady, and that she did not appear to be on the verge of passing out. He described Oakley as "seem[ing] pretty normal" and not "intoxicated at all" at the end of the night.

¶13    Testimony varied as to whether Heinemeier appeared intoxicated. As noted, Oakley believed Heinemeier was intoxicated while at the bars, and

7

Renee likewise described him as having been "buzzed" at that point. Jane, too, believed Heinemeier was impaired based on "his body language" and the fact that "he was slurring a little bit" and described him as being "drunk" "and not with it." Ed, however, disagreed—when asked if Heinemeier appeared intoxicated, he described Heinemeier as "[a]ppear[ing] to be having a good time" and that he "couldn't rate" Heinemeier's level of intoxication. Ed also disputed that Heinemeier's speech was slurred, that Heinemeier was unsteady on his feet, or that he appeared to be about to pass out or black out.

¶14     Jane, Renee, and Ed also confirmed multiple parties used drugs that night. According to Jane, Oakley smoked marijuana but denied that either she or Ed had done so. Jane also testified that Heinemeier gave Oakley speed[5] and that she herself, along with Heinemeier, Renee, and Ed, had smoked meth later in the evening with Oakley also having taken "[o]ne or two hits" from the pipe. Renee likewise testified that Oakley snorted meth/speed in the car earlier in the afternoon/evening that Heinemeier had provided and that he, Oakley, Jane, and Ed snorted and/or smoked more meth when they arrived home. Renee denied having smoked meth later in the evening. Ed said he observed Oakley snort and smoke meth and admitted he had as well. Rene additionally testified she and Oakley took psilocybin mushrooms that night and that Heinemeier had provided them. Renee, Jane, and Ed all confirmed that aside from alcohol, they did not report any drug use to law enforcement during the investigation.

¶15     The trial court found Heinemeier guilty of second-degree and third-degree sexual assault as charged. In doing so, the court explained in great

---

[5] Jane used "speed" and "meth" interchangeably.

detail that it found Oakley to be credible and specifically noted Oakley "was in tears" approximately "half the time" she was testifying and that Oakley "was sincere[,]" "did not exaggerate[,]" and "was articulate." The court also agreed with the State's observation that Oakley was "clearly traumatized" by what had occurred. Based on Oakley's testimony, the court found "that she was incapable of consenting" at the time of the assault, and that her failure to disclose her drug use was due to being afraid of her parents finding out. Notably, Oakley's failure to disclose the drug use did "not affect [the court's] opinion about her honesty as to the details of the assault." The court also observed that in Jane's written statement, which was admitted into evidence, Jane described Oakley as having been drinking faster than the others and that it was clear Oakley "*was more than buzzed*[,]" and it further observed that Heinemeier, in the police interview recording played at trial, described Oakley as an honest person. The court also observed that in the interview, Heinemeier had not actually denied that the assault occurred but instead intimated that he hoped he had not done "what she said." At a later date, the court sentenced Heinemeier to three years of initial confinement and ten years of extended supervision on count one (second-degree sexual assault), and one year of initial confinement and one year of extended supervision on count two (third-degree sexual assault) with the sentences running concurrently.

¶16 Heinemeier thereafter filed postconviction motions raising five issues in support of his request for vacatur of the judgment of conviction and a new trial: (1) the State's alleged failure to disclose or correct false testimony and failure to disclose text messages in violation of his due process rights; (2) ineffective assistance of trial counsel for failure to consult with a toxicologist or present expert testimony regarding the interplay between methamphetamines and alcohol at trial, failure to introduce certain text message and witness

9

testimony, and failure to object to improper comments on Oakley's credibility; (3) prosecutorial misconduct requiring a new trial; (4) failure to require proof beyond a reasonable doubt by misapplying the required elements of the second-degree sexual assault charge; and (5) the trial court's alleged improper reliance on extraneous information and hearsay in evaluating Oakley's credibility at trial.

¶17     The postconviction court denied the motions in a written order without holding a hearing.[6]  The court first concluded no due process violation related to Oakley's testimony about drug use occurred because one, it found the State had been unaware of Oakley's methamphetamine use, and two, that because Oakley's testimony about who she had or had not told "about her drug use [was] confusing and inconsistent[,]" "there was no clear statement in the record that needed to be corrected."  The court likewise rejected each of Heinemeier's ineffective assistance of counsel arguments, concluding that trial counsel's strategies regarding which witnesses to call or not call and which evidence to introduce or not introduce were not deficient, and that the trial court appropriately exercised its discretion in evaluating Oakley's credibility.  It also rejected Heinemeier's argument that a toxicology expert witness would have impacted the trial court's conclusions regarding Oakley's credibility, described Heinemeier's argument that the State failed to disclose text messages and phone records—messages and records it did not have—as "nonsense[,]" and rejected Heinemeier's argument that his recorded statement regarding Oakley's truthfulness was

---

[6] The Honorable James K. Muehlbauer entered the orders denying Heinemeier's postconviction motion and subsequent motion for reconsideration following Judge Pouros's recusal.

inadmissible pursuant to WIS. STAT. § 906.08(1)(b), and that trial counsel erred in failing to object.

¶18 As for Heinemeier's remaining postconviction arguments, the postconviction court: (1) determined that even if the prosecutor had made improper statements in closing arguments, there was nothing to suggest any such arguments impacted the trial court's conclusion; (2) rejected Heinemeier's claim that the trial court failed to properly apply the law in concluding Oakley was incapable of consenting because Heinemeier took the court's "individual comments … out of context, rather than viewing the court's decision as a whole"; (3) concluded the evidence Heinemeier claimed the trial court improperly relied upon—Oakley's and Jane's written statements—had been admitted into evidence and that the trial testimony largely addressed the written statements; and (4) concluded the trial court did not err in referencing its judicial training regarding brain development in young adults and that Heinemeier's suggestion that the court could not "take into account the well known fact that brain development in young adults is not yet complete" was "ludicrous."

¶19 Heinemeier filed a motion for reconsideration arguing the postconviction court had "relied upon manifest errors of law or fact." The court again denied the motion in a written order without a hearing, stating Heinemeier did nothing more than "rehash[] and reargue[] the same matters already analyzed and decided by the court." Additional facts will be developed below as necessary. Heinemeier appeals.

## II. STANDARD OF REVIEW

¶20 "The standard of review of a circuit court's decision denying a motion for postconviction relief without a hearing is well established." ***State v.***

11

*VanderGalien*, 2024 WI App 4, ¶32, 410 Wis. 2d 517, 2 N.W.3d 774 (2023). "A postconviction motion must allege sufficient material facts that, if true, would entitle the defendant to relief." *Id.*; *State v. Ruffin*, 2022 WI 34, ¶27, 401 Wis. 2d 619, 974 N.W.2d 432. Whether a motion does so is a question of law we review de novo. *State v. Allen*, 2004 WI 106, ¶9, 274 Wis. 2d 568, 682 N.W.2d 433. "If the motion raises such facts, the circuit court must hold an evidentiary hearing." *Id.* A defendant is not entitled to relief if the motion "contains 'only conclusory allegations, or if the record conclusively demonstrates that the defendant is not entitled to relief.'" *VanderGalien*, 410 Wis. 2d 517, ¶32 (quoting *Ruffin*, 401 Wis. 2d 619, ¶28). Under such circumstances, whether to grant or deny a hearing is within the court's discretion. *Allen*, 274 Wis. 2d 568, ¶9. We review discretionary decisions for an erroneous exercise of discretion. *Id.*

¶21 We review a circuit court's denial of "a motion for reconsideration under the erroneous exercise of discretion standard." *Koepsell's Olde Popcorn Wagons, Inc. v. Koepsell's Festival Popcorn Wagons, Ltd.*, 2004 WI App 129, ¶6, 275 Wis. 2d 397, 685 N.W.2d 853.

## III. DISCUSSION

¶22 We must determine whether the postconviction court erred in denying Heinemeier's postconviction motions and motion for reconsideration. To do so, we review each of Heinemeier's asserted due process violations, his claim that he received ineffective assistance of counsel, and his claim that the trial court erred in considering written statements he says were not properly admitted at trial.

¶23 Heinemeier identifies what he says are multiple violations of his rights that occurred at trial, and he attributes these errors to the State, trial counsel, and the trial court. First, Heinemeier contends the State violated his due process

rights by either failing to disclose exculpatory evidence as required by ***Brady v. Maryland***, 373 U.S. 83, 87 (1963), or alternatively, by failing to correct what he says was Oakley's perjured testimony as required by ***Napue v. Illinois***, 360 U.S. 264, 269 (1959). Both of these arguments relate to Oakley's testimony regarding her drug use the night of the assault. As to the former, Heinemeier contends the State failed to disclose that Oakley consumed anything other than alcohol that night. As to the latter, Heinemeier contends that if Oakley truly had not disclosed her drug use, her eventual testimony that she did disclose that information to the State was untrue, and the State failed to correct her testimony. Heinemeier posits these errors were material because they went to Oakley's credibility, which played a significant role in the court's conclusions.

¶24 Next, Heinemeier asserts trial counsel made numerous errors that either individually or collectively amounted to ineffective assistance of counsel. Specifically, he contends trial counsel was ineffective for failing to consult with a toxicologist regarding the interplay between alcohol and methamphetamines, and points to a post-trial report he received from an expert suggesting Oakley would *not* have been so intoxicated that she was unable to consent and that she would not have passed out if she had taken methamphetamines. He also says trial counsel was ineffective for failing to introduce text messages and testimony that would show Oakley knew "meth" and "speed" were the same and "that methamphetamine use prevents the user from being able to sleep[.]" Finally, he says trial counsel erred in failing to object to evidence he says bolstered Oakley's credibility in violation of ***State v. Haseltine***, 120 Wis. 2d 92, 352 N.W.2d 673 (Ct. App. 1984), and ***State v. Krueger***, 2008 WI App 162, 314 Wis. 2d 605, 762 N.W.2d 114. Heinemeier contends each of these deficiencies was prejudicial.

¶25 Third, Heinemeier argues the trial court violated his due process rights by lowering the State's burden of proof for establishing Oakley was intoxicated "to a degree which render[ed]" her incapable of consenting. *See* WIS. STAT. § 940.225(2)(cm). Heinemeier says the court improperly determined that "incapable is not beyond some point of intoxication" but rather is "whatever the fact finder assesses to be incapable based upon the facts and the testimony." He says the court therefore required the State to prove only that Oakley "was intoxicated *and* incapable of consenting" rather than requiring it to establish Oakley was "intoxicated 'to a degree which renders' her incapable of consenting[,]" which he says requires something more than being "beyond the basic point of intoxication."

¶26 Finally, Heinemeier claims the trial court erroneously based its guilty verdicts at least in part on inadmissible hearsay. He says the court erred in referencing two exhibits admitted at trial—Oakley's written statement (Exhibit 6) and Jane's written statement (Exhibit 24)—because, he argues, those exhibits were not admitted in their entirety but rather only in part and only for impeachment purposes. Heinemeier argues this was prejudicial because the court's reliance on those exhibits impacted its credibility determinations.

¶27 Heinemeier says that based on these allegations, he is entitled to either a new trial or an evidentiary hearing. We disagree.

A. *The State's Alleged Due Process Violations*

¶28 When reviewing a due process claim, we accept a circuit court's factual findings unless those findings are clearly erroneous. *State v. Wayerski*, 2019 WI 11, ¶35, 385 Wis. 2d 344, 922 N.W.2d 468. However, whether a

constitutional violation occurred is a question subject to our independent review. *Id.*

¶29   At trial, Oakley initially denied having taken drugs on the day of the assault; on cross-examination, however, she eventually admitted to having smoked marijuana throughout the night and taken speed during the afternoon.   When defense counsel questioned whether she had reported that drug use to law enforcement during its investigation, she denied having done so.   When defense counsel pressed further, Oakley stated she "eventually told … somebody … I'm not sure who it was specifically, but I did let somebody know" and that she "believe[d]" she eventually told a detective she had taken drugs when she, the detective, "and the attorney met up I believe I mentioned that there were drugs involved, yes."   On redirect, however, Oakley responded in the negative when the prosecutor asked whether she had reported the drug use to law enforcement. Heinemeier says that based on this testimony, a violation of his due process rights occurred in one of two ways: (1) Oakley lied about having disclosed the drug use prior to trial and the State failed to correct that lie (*Napue* violation); or (2) Oakley actually did disclose her drug use prior to trial and the State failed to disclose exculpatory evidence (*Brady* violation).

¶30   The State's suppression "of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady*, 373 U.S. at 87.   To establish a *Brady* violation, a defendant must establish: "(1) the evidence at issue [is] favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence [was] suppressed by the State, either willfully or inadvertently; and (3) the evidence [is] material."  *Wayerski*, 385 Wis. 2d 344, ¶35.  "Evidence is not material under *Brady* unless the nondisclosure

15

'was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.'" *Wayerski*, 385 Wis. 2d 344, ¶36 (citation omitted). The test for materiality under "*Brady* is the same as the prejudice prong" set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Wayerski*, 385 Wis. 2d 344, ¶36.

¶31 "[A] conviction obtained through use of false evidence, known to be such by representatives of the State," also constitutes a due process violation. *Napue*, 360 U.S. at 269. *Napue* requires the State to correct witness testimony it knows to be false. *Id.* To establish a *Napue* violation such that a new trial is warranted, a defendant must show: "(1) that there was false testimony; (2) that the government knew or should have known it was false; and (3) that there is a likelihood that the false testimony affected the judgment of the [factfinder]." *United States v. Freeman*, 650 F.3d 673, 678 (7th Cir. 2011).

¶32 Heinemeier bears the burden of demonstrating a due process violation under *Brady* or *Napue* occurred. *See State v. Harris*, 2004 WI 64, ¶13, 272 Wis. 2d 80, 680 N.W.2d 737. He has not done so.

¶33 In its written order denying Heinemeier's postconviction motions, the postconviction court rejected both the alleged *Brady* and *Napue* violations based on its conclusion that Oakley's testimony regarding "her drug use and whether she told [the detective] or the prosecutor about her drug use [wa]s confusing and inconsistent at best[,]" and its finding that the State had not previously been aware of the drug use. We agree that Oakley's testimony was "confusing and inconsistent" on this point, and given the lack of clarity in Oakley's testimony as to whether she did or did not report the drug use to law enforcement or the State prior to trial, Heinemeier can establish neither that the

16

State withheld exculpatory evidence under *Brady* nor that the State failed to correct testimony it knew was incorrect contrary to *Napue*.

¶34     We also agree with the State's contention that even if Heinemeier could establish *some* of the required elements under either *Brady* or *Napue*, each claim would ultimately fail due to a lack of prejudicial effect. First, Heinemeier's allegations fundamentally relate to Oakley's drug use and the impact that information had on Oakley's credibility. However, that Oakley *had* used drugs on the night of the assault was ultimately presented at trial, and importantly, trial counsel's questioning regarding Oakley's drug use that night—which had not come up earlier in her testimony—clearly reflects that trial counsel already had at least some prior knowledge of Oakley's drug use. Second, the trial court explicitly stated in rendering its verdict that Oakley's failure to report her drug use did not impact its credibility determination: "I conclude from the evidence that [Oakley] was afraid to disclose that she had been using drugs because she didn't want her parents to find out. *This does not affect my opinion about her honesty as to the details of the assault*." (Emphasis added). This explicit credibility determination belies any suggestion that the court would have reached a different conclusion even if Oakley *had* lied about her belief that she had reported the drug use prior to trial.

¶35     Because the Record conclusively establishes that neither a *Brady* nor *Napue* due process violation occurred, Heinemeier was not entitled to an evidentiary hearing on this issue.

### B. Ineffective Assistance of Counsel

¶36 Heinemeier next argues he has asserted sufficient facts in his postconviction motion that, if true, would entitle him to a hearing on his ineffective assistance of counsel claims. We disagree.

¶37 "An ineffective assistance of counsel claim presents a mixed question of fact and law." *State v. Pico*, 2018 WI 66, ¶13, 382 Wis. 2d 273, 914 N.W.2d 95. An appellate court "will not reverse the circuit court's findings of fact unless they are clearly erroneous." *Id.* "Findings of fact include 'the circumstances of the case and counsel's conduct and strategy.'" *State v. Thiel*, 2003 WI 111, ¶21, 264 Wis. 2d 571, 665 N.W.2d 305 (citation omitted). Whether the facts demonstrate ineffective assistance of counsel is a matter of law we review independently. *Id.*

¶38 To establish ineffective assistance of counsel, a "defendant must show that counsel's performance was deficient" and "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. To establish deficiency, a defendant must show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed … by the Sixth Amendment." *Id.* In other words, "a defendant must establish, based on the totality of the circumstances, that counsel's performance fell below an objective standard of reasonableness." *State v. Savage*, 2020 WI 93, ¶31, 395 Wis. 2d 1, 951 N.W.2d 838. "To show prejudice, a defendant must show 'that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.*, ¶32 (quoting *Strickland*, 466 U.S. at 687). Stated differently, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

*Strickland*, 466 U.S. at 694. "Where the petitioner fails to satisfy either prong of the ineffective assistance of counsel analysis we need not consider the other." *State v. Breitzman*, 2017 WI 100, ¶81, 378 Wis. 2d 431, 904 N.W.2d 93; *see Strickland*, 466 U.S. at 697.

¶39 Heinemeier raises three ways in which he believes trial counsel provided ineffective assistance of counsel. We reject each in turn.

¶40 Heinemeier first asserts trial counsel was ineffective for failing to consult with an expert witness or to otherwise introduce expert testimony regarding the effects and interactions of alcohol and methamphetamines. In support of this argument, he points to an expert witness report he obtained in pursuing his postconviction motion and argues this report demonstrates that at the time of the assault, Oakley would not have been intoxicated to a degree that would have rendered her incapable of consenting and that due to the interactions between alcohol and methamphetamines, Oakley's testimony regarding her level of intoxication and that she passed out was improbable. Heinemeier also asserts an expert would have confirmed that "chronic use of alcohol and methamphetamines, both of which [he] was using that night, *can* lead to erectile dysfunction." (Emphasis added.)

¶41 Even if trial counsel had introduced expert testimony similar to the information Heinemeier points to in the post-trial report, it is unlikely that information would have altered the trial court's conclusions. Tellingly, the report Heinemeier relies on was premised on information taken from *Heinemeier*'s perspective—it was based on *his* version of what occurred, *his* version of the amount of alcohol Oakley consumed and when, and *his* version of Oakley's drug use that night. However, the court found *Oakley*'s testimony regarding her alcohol

consumption and drug use to be credible, which includes her testimony that although she ingested "speed" during the afternoon, she did not ingest methamphetamines later that night and that she felt very intoxicated due to the alcohol. Additionally, to the extent trial counsel chose to instead rely on eyewitness testimony to establish that Oakley was not intoxicated, that decision appears to have been reasonable—even though the court ultimately concluded it was Oakley's version of events that was credible.[7] *See, e.g.*, **State v. Wood**, 2010 WI 17, ¶¶73-74, 323 Wis. 2d 321, 780 N.W.2d 63 ("It is within an attorney's discretion to call or not call a particular witness, if the circumstances of the case reasonably support such a decision.") Likewise, to the extent Heinemeier's assertion that methamphetamine use *can* lead to erectile dysfunction may be accurate, it does not inherently follow that that was the case on the night of the assault, and as repeatedly noted herein, the court concluded Oakley credibly

---

[7] We acknowledge that because the postconviction court denied Heinemeier's motions without a **Machner** hearing, we do not know trial counsel's exact trial strategies. *See* **State v. Machner**, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979). However, this does not ultimately impact our analysis under the circumstances present here.

testified that Heinemeier *had* penetrated her vagina with his penis during the assault.[8]

¶42 Assuming, however, that trial counsel was deficient for failing to introduce such evidence, such deficiency was not prejudicial. The crux of this aspect of Heinemeier's ineffective assistance claim fundamentally relates to Oakley's level of intoxication and consent, and the trial court definitively found Oakley's testimony about how she felt after consuming multiple alcoholic beverages and other drugs—and importantly, at what points during the afternoon and evening she actually consumed them—credible. Heinemeier also seemingly ignores that Jane's admission that she had previously reported that Oakley "appeared more than a little buzzed" and that "this was the most intoxicated" she had seen Oakley further supported the court's credibility determination. And, as noted, Heinemeier's toxicologist based his report on information he obtained from Heinemeier—information the court effectively rejected in having accepted Oakley's version of what occurred that night. Taken as a whole, there is no *reasonable* likelihood that a toxicologist's input regarding the impact between

---

[8] Interestingly, while arguing that the toxicologist he consulted postconviction opined in his report that methamphetamine use can lead to erectile dysfunction, which Heinemeier says casts doubt as to whether he could have assaulted Oakley at all, Heinemeier simultaneously argues that the toxicologist *also* indicated that "methamphetamine use causes physical arousal and increased libido." Heinemeier says that because he and Oakley both used methamphetamines prior to the assault, "the increased libido and arousal may help explain why they may have been more open to sexual activity." Failure to introduce testimony that appears inherently contradictory—on one hand that using methamphetamines would have prevented him from engaging in sexual activity due to erectile dysfunction, and on the other hand that methamphetamine use may have increased his libido and physical arousal—was not prejudicial here. Heinemeier's suggestion that Oakley's methamphetamine use may have increased her libido, which in turn may have made her more likely to consent, is also unavailing. An increased libido does not necessarily lead to consent, and the trial court found that Oakley's testimony that she did *not* consent was credible. It is therefore highly improbable that this type of expert testimony would have impacted the trial court's credibility determinations.

alcohol and methamphetamines would have drastically altered the court's credibility finding.

¶43 Next, Heinemeier argues trial counsel was deficient in failing to introduce text messages or testimony regarding Oakley's prior methamphetamine use, which he says would have contradicted any suggestion that Heinemeier had provided Oakley with drugs for the ultimate purpose of taking sexual advantage of her, refuted Oakley's claim that she did not know "speed" and "meth" were the same thing, and confirmed "that methamphetamine use prevents the user from being able to sleep, rendering [Oakley's] claim of passing out and waking up to being assaulted not credible."

¶44 We agree with the State that the aforementioned texts bear little relevance as to Oakley's intoxication and credibility and therefore, even if we assume trial counsel was somehow deficient in not seeking to admit them, any such deficiency was not prejudicial. First, multiple witnesses confirmed that Heinemeier had provided Oakley with the drugs, and whether Oakley had previously used methamphetamines or not has little to no bearing on his reason for having supplied her with drugs that day. Second, whether Oakley understood that "speed" and "meth" referred to the same substance is unlikely to have undermined the trial court's credibility finding, as knowing or not knowing the name of a specific drug does not render Oakley more or less capable of describing how that drug—or any others—made her feel. Third, even if the text messages established Oakley was aware that "speed" or "meth" can impact a person's ability to sleep, Oakley testified that although she had taken "speed" on the way to the second bar during the afternoon, she had not smoked methamphetamine later that night. Given the time that elapsed between when Oakley ingested methamphetamines—testimony the court found credible—and the time of the assault, Oakley's

knowledge of methamphetamine's impact on sleep would have been minimal at best. Accordingly, the Record conclusively establishes these text messages would not have altered the outcome.

¶45 Finally, Heinemeier claims trial counsel was ineffective for failing to object to what he says is improper evidence that bolstered Oakley's credibility. Heinemeier says this first occurred when trial counsel failed to object when the detective, in responding to the State's question as to why he did not obtain a written statement from Renee, stated that he did not do so because he "felt that [Oakley's] statement was credible." He says trial counsel was ineffective a second time when he did not object to the admissibility of Heinemeier's statements regarding Oakley's character in the recorded interview played at trial. Heinemeier is wrong on both counts.

¶46 *Haseltine* precludes a witness from opining as to another witness's truthfulness. 120 Wis. 2d 92, 96. "The *Haseltine* rule is intended to prevent witnesses from interfering with the [factfinder]'s role as the 'lie detector in the courtroom.'" *State v. Snider*, 2003 WI App 172, ¶27, 266 Wis. 2d 830, 668 N.W.2d 784 (quoting *Haseltine*, 120 Wis. 2d at 96). Here, the detective testified about what he believed during the investigation; he did not testify that he believed Oakley was truthful at trial. As the State points out, this is similar to *Snider*, where counsel elicited testimony from a detective at trial regarding whether the detective believed the victim's or defendant's version of what had occurred. 266 Wis. 2d 830, ¶25. In *Snider*, we concluded no *Haseltine* violation occurred because the detective there had not testified as to whether "another witness [wa]s telling the truth *at trial*." *Snider*, 266 Wis. 2d 830, ¶27 (emphasis added); *see also State v. Smith*, 170 Wis. 2d 701, 718-19, 490 N.W.2d 40 (Ct. App. 1992). Here, the detective's statement that he "felt that [Oakley]'s statement was credible"

arose in the context of explaining what occurred when attempting to collect evidence from Renee's and Heinemeier's home and why he did not obtain a written statement from Renee during the investigation. This testimony did not in any way reference the truthfulness or credibility of Oakley's *trial testimony*, and accordingly, no ***Haseltine*** violation occurred. *See* ***Snider***, 266 Wis. 2d 830, ¶¶25-27. Because the detective's testimony did not violate ***Haseltine***, trial counsel could not have been ineffective for failing to object to the testimony. *See, e.g.*, ***State v. Stroik***, 2022 WI App 11, ¶36, 401 Wis. 2d 150, 972 N.W.2d 640 ("attorneys are generally not required to advance losing arguments"); ***State v. Cameron***, 2016 WI App 54, ¶27, 370 Wis. 2d 661, 885 N.W.2d 611 ("It is not deficient performance for counsel not to make a pointless objection.").

¶47    We likewise reject Heinemeier's assertion that trial counsel, despite objecting on hearsay grounds, was otherwise ineffective for failing to object to the admissibility of Heinemeier's recorded interview. First, to the extent Heinemeier suggests his own interview comments violated ***Haseltine***, we disagree, as these statements did not amount to testimony regarding the truthfulness of Oakley's trial testimony. Second, these statements were, as the State contends, admissible as a statement by a party opponent. *See* WIS. STAT. § 908.01(4)(b)1. (a statement offered against a party is not hearsay if it is "[t]he party's own statement"). Third, even if we assume, as Heinemeier suggests, that these statements were otherwise inadmissible pursuant to WIS. STAT. § 906.08(1)(b),[9] the admission of these statements was not prejudicial given the veracity of the trial court's credibility

---

[9] WISCONSIN STAT. § 906.08(1)(b) provides that "[e]xcept with respect to an accused who testifies in his or her own behalf, evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise."

determination, which it said was based on Oakley's trial testimony itself. In other words, there is no "reasonable probability" the court would have reached a different conclusion regarding Oakley's credibility had it not heard Heinemeier's statements on the recording. *See Strickland*, 466 U.S. at 694.

¶48 Based on the foregoing, the Record conclusively establishes that regardless of whether we consider each of Heinemeier's arguments individually or cumulatively, trial counsel was not ineffective and Heinemeier was therefore not entitled to a *Machner* hearing on his ineffective assistance of counsel claims.

### C. The Trial Court's Alleged Violations

#### 1. Failure to Require Proof Beyond a Reasonable Doubt

¶49 Heinemeier next asserts the trial court violated his due process rights because it failed to hold the State to its burden of proof under WIS. STAT. § 940.225(2)(cm). He says the court did not require that the State establish Oakley was "under the influence of an intoxicant to a degree which renders [her] incapable of giving consent" but rather that it required only that the State prove Oakley was intoxicated. In support, he points to the State's closing arguments in which the prosecutor argued the State had proven Heinemeier had "sexual intercourse with a person who was under [the] influence of an intoxicant" and that "incapable is not beyond some point of intoxication" but rather is "whatever the

fact finder assesses to be incapable based upon the facts and testimony."[10] This argument lacks merit.

¶50 "[T]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970); *see also* *State v. Harvey*, 2002 WI 93, ¶19, 254 Wis. 2d 442, 647 N.W.2d 189. "States may not 'deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt every element of the charged offense.'" *Harvey*, 254 Wis. 2d 442, ¶19 (citation omitted). We review alleged constitutional violations independently. *Wayerski*, 385 Wis. 2d 344, ¶35.

¶51 Heinemeier complains that in endorsing the prosecutor's statement that "incapable is not beyond some point of intoxication" and that incapable is, instead, "whatever the fact finder assesses to be incapable based upon the" evidence presented, the trial court applied the wrong legal standard. It did not. First, the court clearly and unequivocally recited the elements of second-degree sexual assault at the outset of its oral decision, including that not only was the State required to establish Oakley was intoxicated, but also that she "*was under the influence of an intoxicant **to a degree which** rendered her incapable of giving consent*." (Bold emphasis added.) Second, immediately prior to finding Oakley

---

[10] To the extent Heinemeier argued in his postconviction motion that this amounted to prosecutorial misconduct, he does not argue prosecutorial misconduct on appeal. He likewise does not develop any other prosecutorial misconduct argument on appeal despite having raised them in his postconviction motions. Any argument Heinemeier raised in his postconviction motions that he does not address on appeal is deemed abandoned and will not be considered further. *See, e.g.*, *A.O. Smith Corp. v. Allstate Ins. Cos.*, 222 Wis. 2d 475, 491, 588 N.W.2d 285 (Ct. App. 1998) ("[A]n issue raised in the trial court, but not raised on appeal, is deemed abandoned.").

"was incapable of consenting[,]" the court recounted Oakley's testimony regarding the alcohol and drugs she had ingested and the effects the alcohol and drugs had on how she felt at the time of the assault. It is therefore clear that the court's finding that Oakley was incapable of consenting was tied directly to its consideration of Oakley's level of intoxication at the time of the assault. This is what WIS. STAT. § 940.225(2)(cm) requires, and neither the trial court nor the postconviction court erred.

2. Reliance on Allegedly Improper Hearsay

¶52 Finally, Heinemeier contends the trial court impermissibly considered hearsay evidence when it referenced Oakley's and Jane's written statements (Exhibits 6 and 24, respectively) and in noting in particular that Oakley's written statement was "entirely consistent" with her trial testimony. He says that in doing so, "[t]he trial court explicitly based its credibility determinations at least in part upon inadmissible hearsay" and points to statements contained within each of the written statements he says "were not presented" as evidence.

¶53 "Whether an exhibit should be [made available to the factfinder] during deliberations is a discretionary decision for the circuit court." *State v. Anderson*, 2006 WI 77, ¶27, 291 Wis. 2d 673, 717 N.W.2d 74, *overruled on other grounds*, *State v. Alexander*, 2013 WI 70, 349 Wis. 2d 327, 833 N.W.2d 126. A court should consider multiple factors in resolving this question, "includ[ing] 'whether the exhibit will aid the [factfinder] in proper consideration of the case, whether a party will be unduly prejudiced by submission of the exhibit, and whether the exhibit could be subjected to improper use[.]'" *Anderson*, 291 Wis. 2d 673, ¶27 (citation omitted). We review discretionary decisions under the

clearly erroneous standard of review. *Id.*, ¶28. "A circuit court erroneously exercises its discretion when it fails to exercise its discretion, when the facts do not support the circuit court's decision, when the circuit court applies the wrong legal standard, or when the circuit court fails to use a demonstrated rational process to reach a reasonable conclusion." *Id.* An error in making an exhibit available to the factfinder "during deliberations is subject to a harmless error test." *Id.*, ¶27. The "test for harmless error asks whether it is 'clear beyond a reasonable doubt that a rational [factfinder] would have found the defendant guilty absent the error.'" *Id.*, ¶115 (citation omitted).

¶54 Heinemeier acknowledges that the trial court received both Exhibits 6 and 24 into evidence at trial but argues they were admitted only for impeachment purposes, and then only as to the specific statements addressed during Oakley's and Jane's testimony. Although introduced for impeachment purposes, these Exhibits were ultimately admitted without limitation at trial. After trial counsel introduced Exhibit 6 during Oakley's testimony and Oakley confirmed it was the written statement she had provided (and later confirmed it was "thorough and correct"), counsel moved the exhibit into evidence without objection and without limitation and published it to the court. The same is true of Jane's written statement—when asked about the statement, Jane confirmed it was her written statement and agreed when the prosecutor asked if "it was a true and accurate statement[,]" and when the State moved to admit Exhibit 24, Jane's written statement, into evidence, trial counsel did not object.

¶55 To the extent Oakley testified about specific aspects of her written statement, it was not improper for the trial court to consider *those* statements in rendering its decision and in evaluating her credibility, and the court could consider the consistency between those specific statements and Oakley's trial

testimony. Again, the same is true of Jane's written statement. When asked whether she had "indicate[d] that [Oakley] was intoxicated[,]" that it was the "[m]ost intoxicated" she had ever seen Oakley, and that she "could tell that [Oakley] was more than buzzed[,]" Jane agreed. The court could clearly rely on those statements, too, when weighing Oakley's credibility.

¶56 Although we are not convinced the trial court erred in considering Exhibits 6 and 24 as a whole in its deliberation, even if we concluded that it had erred, we are ultimately satisfied that any such error was harmless. In explaining why it believed Oakley to be credible, the court relied heavily on her trial testimony and explicitly referenced numerous aspects of her testimony in rendering its decision. That, combined with the aspects of the written statements utilized for impeachment purposes, leaves no doubt that the court would have reached the same credibility determination even had it *not* considered the portions of the written statements Heinemeier challenges on appeal—particularly given its statement that it did "not consider it to be a close case" at all. Because the court would have reached the same conclusion had it not considered those portions of the written statements Heinemeier challenges, the error, if any such error did occur, was harmless.

## IV. CONCLUSION

¶57 For all of the foregoing reasons, we conclude the Record conclusively demonstrates Heinemeier is not entitled to the requested relief. Accordingly, the postconviction court did not erroneously exercise its discretion in denying Heinemeier's motions without a hearing, and it likewise did not err in denying Heinemeier's motion for reconsideration.

*By the Court*.—Judgment and orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.